**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD A. CARROLL,** | : | |
| | : | |
| **Plaintiff** | | **CIVIL ACTION NO. 3:12-0553** |
| | : | |
| **v.** | | |
| | : | **(JUDGE MANNION)** |
| **CLIFFORD TOWNSHIP, *et al.*,** | | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Pending before the court is the defendants' motion for summary judgment, (Doc. No. 33), on the claims for First Amendment retaliation and interference with the right of association in plaintiff's second amended complaint ("complaint"). (Doc. No. 15). For the following reasons, defendants' motion will be **GRANTED IN PART AND DENIED IN PART**.

## I.     BACKGROUND[1]

Plaintiff Donald Carroll was hired as a police officer by Clifford Township in June of 2001. He brings this suit against Clifford Township and township supervisors Dennis Knowlton and Chris Marcho, alleging retaliation in violation of the First Amendment and interference with his First Amendment

---

[1]The facts in the background section are taken from defendants' statement of facts, (Doc. No. 34), and plaintiff's answer, (Doc. No. 36), except where otherwise noted. Facts in dispute are noted.

right to association. (Doc. No. 15). The third township supervisor, Barry Searle, is not a defendant in this action.

Plaintiff filed a lawsuit in state court against Clifford Township in August 2009,[2] concerning violations of the Police Tenure Act. (Doc. No. 34, at ¶5; Doc. No. 36, at ¶5). The lawsuit was decided in favor of the township on September 6, 2013, and post-trial motions and an appeal have been filed in that case.

In 2007, plaintiff first asked a then-supervisor of the town to sign an application for his admittance into the Fraternal Order of Police ("FOP"). The application was not signed in 2007.[3] Plaintiff then produced another FOP application to the township supervisors in 2011, and another in 2012. Plaintiff testified that when he gave the application to the supervisors in 2012, and indicated that it was for protection of his civil rights, he was told that "it was probably a good thing," and that they would look into it. (Doc. No. 34, Ex. 1, at 49-53). Supervisor Barry Searle, who is not a defendant in this matter, was put in charge of investigating the FOP, and discovered that it was a union. He

---

[2]The parties dispute the date of the filing of the state court lawsuit, with defendants claiming the suit was filed in April of 2009, and plaintiff claiming it was August of 2009. Neither party submitted a docket sheet of the state court action into the record. The state court decision, (Doc. No. 34, Ex. 5), reflects that the complaint was filed on August 31, 2009.

[3] Defendant Knowlton was a supervisor at that time, but is not alleged to have denied plaintiff's 2007 request. Defendant Marcho was not a supervisor at the time of the 2007 request.

contends that plaintiff described the group to him as more of a social group. (Doc. No. 34, Ex. 2, at 60). He testified that no decision as to whether to sign the FOP application was made, but that it got pushed to the side as other issues, including a lawsuit with another police officer, arose. Searle felt that the FOP application became a "moot point" after the department was disbanded. (Id., at 63). Neither the 2011 nor the 2012 applications were signed by any Clifford Township supervisor, and plaintiff did not submit either application to the FOP.

The township was experiencing financial difficulties from 2008 until the time plaintiff filed this action on March 28, 2012. In 2008, plaintiff's health insurance, as well as that of other township employees, was terminated, although plaintiff alleges he did not learn about the termination of his health care benefits until June of 2009. The township supervisors and plaintiff corresponded throughout this time period, and the budget constraints and their effect on the police budget were mentioned to plaintiff during this time period. (Doc. No. 34, Exs. 10-11, 13). The township was nearly one-half a million dollars in debt by 2012, largely on account of losing a long-pending lawsuit against a township contractor. In 2012, this budget difficulty resulted in a reduction in the police budget and the need to cut the hours of other police officers. (Doc. No. 34, Ex. 2, 37:16-38:12).[4] Plaintiff, who was made

_____

[4]Plaintiff, in his answer to defendant's statement of facts, denies the budgetary difficulties of the township, denies that the decision to reduce police

chief of police sometime in 2007, was responsible for making the police schedule. After the budget was reduced, plaintiff maintained a full-time schedule, while other officers worked part-time. (Doc. No. 34, Exs. 2, 9, 14). In May of 2012, the township supervisors disbanded the police department, citing the need to get the township out of debt caused by legal fees stemming from the lawsuit with the contractor, and applying the police budget directly to loans to reduce the township's debt. (Id., at Ex. 8). Plaintiff disputes that the disbandment was legal, as he alleges the procedures used to disband the department were not proper, and that the supervisors should have disbanded the department by ordinance, and not by a vote at a meeting. At the time of the disbandment, plaintiff was the only full-time police officer, and there were two part-time officers in the department.[5] The township has not had a police

---

hours was budgetary, and denies that the township was in debt, without citing to the record to show that these facts are genuinely in dispute. (Doc. No. 36, at ¶¶ 9, 10, 12). Plaintiff baldly asserts, without citation, and without addressing the township budget problems, that the police budget was cut as a "way to harm Plaintiff." (Doc. No. 36). As the plaintiff has failed to properly cite to the record in disputing the financial troubles of the township, and the record supports defendants' account of the township finances, the court deems the facts in Doc. No. 34, ¶¶ 9,10, and 12 undisputed for the purpose of this motion, pursuant to Fed.R.Civ.P. 56(e)(2).

[5]Plaintiff's deposition testimony alleges that he was the only officer in the department at the time it was disbanded. However, this self-serving testimony is mere repetition of allegations made in the complaint, and is unsupported by any other evidence in the record. Defendants have submitted to the court payroll records for the months April and May 2012 showing that two other officers were paid for those months, (Doc. No. 34, Ex. 9), the police department schedules for those months showing that two officers besides plaintiff were on the schedule, (Id., Ex. 14), and the deposition of Barry

department, or hired any police officers, since May 2012.

Before the department was disbanded, citizens complained to the township supervisors about police, particularly plaintiff, giving out citations. The circumstances surrounding these complaints are disputed by the parties. Plaintiff alleges that during a township budget meeting in November 2011, defendant Marcho instructed him not to make traffic stops near Marcho's place of business because customers had been complaining, and that plaintiff voiced his opposition to Marcho's request because he felt it was improper not to enforce the law. Defendant Marcho's account of the meeting is that he raised concerns about the method in which citations were being issued, which had been relayed to him by owners of local businesses and by citizens, and that plaintiff replied that it was not Marcho's business, but a matter for Barry Searle, the police commissioner. (Doc. No. 34, Ex. 3, at 21-27). Plaintiff believes that defendant Marcho instructed people to complain about receiving citations.[6]

_____

Searle, (Id., Ex. 2 at 38:11-12, 39:6-10), who testified that at the time the department was disbanded, an officer other than plaintiff was on patrol. Thus, the court deems it undisputed that other officers were active at the time of disbandment.

[6]Plaintiff points to his own deposition to support his assertion that "Marcho incited individuals to complain about plaintiff." (Doc. No. 36, at ¶ 35). But the cite to the deposition only shows that plaintiff *believes* that Marcho was directing others to complain about him - there is nothing in the record, other than plaintiff's assertions of his belief, to support that Marcho directing others to complain.

Plaintiff brought this suit pursuant to 42 U.S.C. §1983 in March 2012, shortly before the police department was disbanded. He has twice amended his complaint. Plaintiff alleges First Amendment retaliation for filing his state court lawsuit in 2008, (Count I), interference with his right to associate with the FOP, (Count II), First Amendment retaliation for filing the instant lawsuit in federal court, resulting in the elimination of his position, (Count III), and politically motivated harm and First Amendment retaliation for defying Marcho's request to stop making arrests on Main Street, (Count IV).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; *see also* Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts

immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III.   DISCUSSION

### Claims Against Knowlton and Marcho in their Official Capacities

Plaintiff brings all claims against Knowlton and Marcho individually and in their capacities as township supervisors. Suits against individuals in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165-166 (1985)(quoting Monell, 463 U.S. at 690, n.55). Such claims are redundant of the claims against Clifford Township and may be dismissed by the court. *See* Desi'z Pizza, Inc. v. City of Wilkes-Barre, 2006 WL 2460881, at *33 (M.D. Pa. 2006); *see also* Burton v. City of Phila., 121 F.Supp.2d 810, 812 (E.D. Pa. 2000). Thus, the claims against Knowlton and Marcho in their official capacities are **DISMISSED**.

### First Amendment Retaliation

"To make out a First Amendment retaliation claim pursuant to §1983, a plaintiff must establish three elements: '(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal connection between the constitutionally protected conduct and the retaliatory action.'" Cooper v.

8

Menges, 2013 WL 5458015 at *3 (October 2, 2013 3d Cir.)(*quoting* Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). To establish a causal connection, the plaintiff must prove either "an unusually suggestive temporal proximity between the protected activity and allegedly retaliatory action" or "a pattern of antagonism coupled with timing to establish a causal link." Cooper, 2013 WL 5458015 at *3 (*quoting* Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). The court must determine whether the evidence of a pattern of antagonism is sufficient "'based on the whole picture.'" Marra v. Phila. Hous. Auth., 497 F.3d 286, 303 (3d Cir. 2007)(*quoting* Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)). Temporal proximity itself is not an element of a retaliation claim, but can be indicative of causation. McLaughlin v. Fisher, 277 Fed.Appx. 207, 219 (3d Cir. 2008)(*citing* Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)). Determining whether temporal proximity alone is enough to show causation is essentially a fact-based inquiry. McLaughlin, 277 Fed. Appx., at 219 (*citing* Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)).

The defendant must be aware of the protected conduct in order to establish the requisite causal connection. Gorum v. Sessoms, 561 F.3d 179, 188 (3d Cir. 2009)(*citing* Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002). A defendant may defeat a plaintiff's claim for retaliation by showing that it would have taken the same action even in the absence of protected

conduct. [Ambrose, 303 F.3d at 493](#).

## Count I

Plaintiff brings three claims for First Amendment retaliation. Count I of the complaint alleges retaliation for filing his state court lawsuit against the township. He alleges that defendants have engaged in a campaign of harassment against him "by falsely accusing him of wrongdoing, inciting criminals to complain about plaintiff's writing of citations, termination of healthcare benefits, and refusal to allow plaintiff to associate with the FOP.**"**

The parties do not dispute that filing a lawsuit is protected activity. *See* [McLaughlin, 277 Fed.Appx., at 216](#). Plaintiff has failed, however, to show that a causal link exists between the protected activity and the failure to sign the FOP application. First, plaintiff cannot show an **"**unusually suggestive temporal proximity" between the filing of the state suit and the failure to sign the FOP. Even assuming the time frame most favorable to plaintiff, his lawsuit was filed on August 31, 2009, and plaintiff submitted an FOP to be signed on March 14, 2011. (Doc. No. [37](#), Ex.2). Eighteen months is too long a time frame to be "unusually suggestive." *See* [Yu v. U.S. Dept. of Vet. Affairs., 2013 WL 2398989 (June 4, 2013 3d Cir.)](#)("unusually suggestive" means within a few days, but no longer than a month, in First Amendment retaliation context)(*citing* [Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 760 (3d Cir. 2004)](#)("over two months" too long to be "unusually suggestive")).

10

Nor does plaintiff show "intervening antagonism between the time of the protected activity and the time of the alleged retaliatory conduct." Kriss v. Fayette Cty., 827 F.Supp.2d 477, 495 (W.D. Pa. 2011)(citing Marra, 497 F.3d, at 302). Plaintiff alleges that his health benefits were terminated, but his benefits were terminated in December 2008, *before* he filed his state lawsuit. Thus, termination of benefits is not evidence of a pattern of antagonism.

Plaintiff has also not shown that complaints against him are indicative of antagonism and retaliation. There is nothing in the record, besides plaintiff's testimony that he believed it was happening, to support that Marcho directed people to complain about him. The record merely shows that there were citizen complaints about citations, some of which were expressed at township meetings, some privately to Marcho. Citizen complaints can hardly be said to be antagonism on the part of defendants, and moreover, there is no evidence to support that the complaints were in any way related to plaintiff's state court lawsuit. Plaintiff also points to the fact that Marcho's brother posted comments on Facebook that were critical of township police as evidence of causation. (Doc. No. 37, Ex. 6). But plaintiff does not point to any evidence in the record that the postings are related to his filing of a lawsuit. Moreover, plaintiff fails to cite to anything to support his assertion that plaintiff "knew and agreed to" the postings. The complaints and Facebook postings concern the actions of persons who are not defendants, and therefore cannot be evidence of antagonism on the part of defendants.

11

Nor does plaintiff show "intervening antagonism between the time of the protected activity and the time of the alleged retaliatory conduct." Kriss v. Fayette Cty., 827 F.Supp.2d 477, 495 (W.D. Pa. 2011)(citing Marra, 497 F.3d, at 302). Plaintiff alleges that his health benefits were terminated, but his benefits were terminated in December 2008, *before* he filed his state lawsuit. Thus, termination of benefits is not evidence of a pattern of antagonism.

Plaintiff has also not shown that complaints against him are indicative of antagonism and retaliation. There is nothing in the record, besides plaintiff's testimony that he believed it was happening, to support that Marcho directed people to complain about him. The record merely shows that there were citizen complaints about citations, some of which were expressed at township meetings, some privately to Marcho. Citizen complaints can hardly be said to be antagonism on the part of defendants, and moreover, there is no evidence to support that the complaints were in any way related to plaintiff's state court lawsuit. Plaintiff also points to the fact that Marcho's brother posted comments on Facebook that were critical of township police as evidence of causation. (Doc. No. 37, Ex. 6). But plaintiff does not point to any evidence in the record that the postings are related to his filing of a lawsuit. Moreover, plaintiff fails to cite to anything to support his assertion that plaintiff "knew and agreed to" the postings. The complaints and Facebook postings concern the actions of persons who are not defendants, and therefore cannot be evidence of antagonism on the part of defendants.

Plaintiff additionally claims that Marcho improperly accused him of wrongdoing at a budget meeting in November of 2011. But plaintiff fails to show any connection, temporal or otherwise, between the lawsuit and Marcho's statements at the budget meeting. Even accepting plaintiff's account of that meeting, the disagreement between plaintiff and Marcho in November 2011 is the only incident possibly indicative of antagonism. But comments made at one meeting do not constitute a *pattern* of antagonism. *See* McGhee v. Thomas Jefferson univ. Hosp., 2013 WL 4663541, at *7 (Aug. 29, 2013 E.D. Pa.)(single disciplinary action insufficient to show pattern of antagonism); Incorvati v. Best Buy Co., Inc. 2013 WL 3283956, at *8 (single event generally does not create harassment or antagonism)(*citing* McCormick v. Allegheny Valley School, 2008 WL 355617, at *18 (Feb. 6, 2008 E.D. Pa.)).

Plaintiff also argues that he was treated differently from another employee, who had his FOP application signed, and that this disparate treatment is indicative of a pattern of antagonism. The record is inadequate to show disparate treatment suggestive of antagonism on the part of defendants. Plaintiff points to nothing in the record to support that the other officer's application was signed "without delay or question," as he asserts it was. The very sparse evidence about the signed FOP application supports only that Barry Searle had heard that an FOP application had been signed for another officer before Searle was township supervisor, and that Searle has "no knowledge" of the circumstances surrounding the signing of that

12

application. (Doc. No. 34, Ex. 2, at 72:10–16). The record also reflects that plaintiff had heard from an FOP representative who had previously lived in the township that an FOP application had been signed for another officer. (Doc. No. 34, Ex. 1, at 38).[7]

Because the only evidence about the "other" FOP application in the record is hearsay, the record does not support that plaintiff was treated disparately. *See* Breslin v. Dickinson Tp., 2012 WL 7177278, at *10 (Mar. 23, 2012 M.D. Pa.)(relying on hearsay statements at summary judgment stage particularly inappropriate where a party relies on such statements to establish material issues of fact). Accordingly, the record does not support that there was disparate treatment of plaintiff.

Finally, the record shows that plaintiff submitted an FOP application in 2007, which application was not signed. As this application was submitted before plaintiff filed his state court lawsuit, the record does not show that plaintiff was treated differently regarding his FOP applications from the time before to the time after he filed his state court lawsuit. *See* Kriss, 504 Fed.Appx. 182, 189 (3d Cir. 2012). A review of the record as a whole simply does not show a causal connection between plaintiff's state court lawsuit and his FOP application not being signed, even drawing all inferences in favor of

---

[7]The record reflects that defendant Knowlton was a supervisor at the time of the alleged previous signing, but Searle and defendant Marcho were not. Knowlton is not alleged to have signed the other, earlier FOP application, or to have been involved in granting it.

the plaintiff. No matter what the township's reasons for not signing the application were, the record does not support that their reasoning had anything to do with plaintiff's state court lawsuit. Accordingly, defendants' motion for summary judgment is **GRANTED** as to Count I of the complaint.

## Count III

In Count III of his complaint, Plaintiff alleges that his position was terminated in retaliation for filing the instant suit in federal court on March 28, 2013. Defendants argue that they are entitled to absolute legislative immunity for the decision to disband the police department.

Absolute legislative immunity shields local legislators from suit under §1983 for their legislative activities. Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998). To be legislative, an act must be substantively and procedurally legislative. In re Montgomery Cty., 215 F.3d 367, 376 (3d Cir. 2000)(*citing* Carver v. Foerster, 102 F.3d 96, 100 (3d Cir. 1996)). "'An act is substantively legislative if it involves "policy-making of a general purpose" or "line-drawing." It is procedurally legislative if it is undertaken" by means of established legislative procedures.'" Montgomery County, 215 F.3d at 376 (*quoting* Carver, 102 F.3d, at 100).

Budget decisions which reflect "a discretionary, policymaking decision implicating the budgetary priorities of the city" and the services it provides are entitled to legislative immunity. Bogan, 423 U.S., at 49. Where positions are

14

eliminated as part of a "city-wide reduction in force," as in Bogan, legislative absolute immunity is appropriate. [Montgomery Cty., 215 F.3d at 376](). In contrast, where a decision is made to eliminate a particular employee, that decision does not involve general policy-making and is not entitled to absolute immunity. Id.

Here, the decision to disband the police department was made by vote of the township supervisors on "Resolution 6." (Doc. No. [34](), Ex. 8). "'Legislative powers require enactment of an ordinance; if an act is accomplished by means other than an ordinance, it is not an exercise of legislative activity.'" [Long v. Bristol Tp., 2012 WL 2864410, at *15 (July 11, 2012 E.D. Pa.)](quoting [Donivan v. Dallastown Borough, 835 F.2d 486, 489 (3d Cir. 1987)]()). 53 P.S. §66601(a) provides that in order to pass an ordinance, supervisors must publish it in a local newspaper before a vote on the ordinance is held.

There is nothing in the record to suggest that the department was disbanded by means of an ordinance, and nothing to suggest that any publication of a proposed ordinance occurred. Thus, the disbandment of the police was not a procedurally legislative act, but rather an administrative one for which absolute immunity is not available. Defendants are therefore not entitled to absolute legislative immunity for disbanding the department.

Plaintiff filed this suit in March 28, 2012, and service was made on defendants on March 30, 2012. (Doc. No. [2]()). The police department was

disbanded on May 8, 2012. (Doc. No. 34, Ex. 8). This time difference of 38 days is too long too be unusually suggestive on its own. *See* Yu, 2013 WL 2398989, at \*3 (nearly one-month delay between protected activity and alleged retaliation too long to be unusually suggestive); Schummer v. Black Bear Distribution, LLC, 2013 WL 4431316, at \*4 (Aug. 15, 2013 D.N.J.)(one month not unusually suggestive); Carmody v. Penn State Univ., 2007 WL 1074862, at \*8 (Apr. 9, 2007 M.D. Pa.)(one month not unusually suggestive).

Even if, however, the time frame is suggestive, the fact remains that it was not only plaintiff whose job was terminated. The entire three-person department was disbanded. The record reflects that in April and May of 2012, two part-time officers were on the police schedule and received pay from the township. Moreover, the minutes from the township meeting, the depositions of defendants, and correspondence between plaintiff and township supervisors all reflect that the township was in debt, and the meeting minutes show that the department was disbanded for financial reasons. At the township meeting in May at which the department was eliminated, supervisors cited township debt as the reason for the elimination, and while they expressed concerns about public safety, ultimately decided that the police budget should be "directly applied to loans for debt reduction." (Doc. No. 34, Ex. 8). They also noted that most other small townships in the area do not have their own police forces, and that the township had been without a police department in the past. (Id.).

There is scant evidence, at best, indicative that the police department was eliminated to retaliate against plaintiff, rather than to ameliorate the township's financial issues. Plaintiff points to a May 4, 2012 email from Searle to plaintiff as evidence of retaliation. On May 4, Searle and plaintiff were emailing about the May police schedule. Searle wrote that he was "concerned that we will have no money for any police coverage" by the end of the year. Plaintiff wrote to Searle:

> "It seems as though you have been staying clear of me, I don't consider you my enemy and I figured you [k]new that about three weeks ago when the twp was served. I would appreciate it if you could stop by here and there to keep up on communications."

(Doc. No. 34, Ex. 13). Searle replied, "the fact that you have opened another lawsuit against us has caused our attorney to advise that I do not have conversations with you without counsel." (Id.) While plaintiff points to this exchange as evidence that the disbandment was retaliatory, the email does not create a question of material fact. Searle is not a defendant in this case, his statement is in response to plaintiff's query, which itself mentions the instant lawsuit, and the email evinces only a knowledge of the lawsuit, not antagonism. The email is insufficient to create a question of material fact.

Plaintiff also argues that because the township hired employees after the police department was terminated, it could not have actually disbanded the department for financial reasons. (Doc. No. 36, ¶ 17). Plaintiff's deposition reflects that "maybe six months" after the disbandment, a tax hike allowed the

17

township to hire road workers and a secretary. (Doc. No. 34, Ex. 1, at 131-32). This testimony refers to events that occurred months after disbandment, and does not provide evidence of retaliation. Moreover, plaintiff explicitly notes that new taxes allowed the hiring to occur. This testimony is not evidence that at the time of the disbandment, the township was not in fact in financial hardship. There is insufficient evidence in the record to lead a reasonable juror to conclude that the termination of the entire police department was retaliation towards plaintiff for filing the instant lawsuit. Defendant's motion for summary judgment as to Count III of the complaint is **GRANTED**.

## Count IV

Count IV of the amended complaint alleges First Amendment retaliation and politically motivated harm for reducing the police department budget two weeks after plaintiff and Marcho had their disagreement at the November 2011 budget meeting. Plaintiff alleges that Marcho instructed him not to give out citations on Main Street, and that voicing his opposition to this instruction and refusing to follow it constitute protected First Amendment activity.

The nature of the statements exchanged at the meeting is disputed, as is whether plaintiff engaged in activity protected by the First Amendment. Regardless of whether the activity was protected or not, plaintiff has failed to show that there is a causal connection between the events of the meeting and

18

the reduced police budget. Indeed, plaintiff has failed to show that the police budget reduction could have been an attempt to harm him, when the record reflects that plaintiff, alone among the active officers at that time, was able to keep working his full-time hours. (Doc. No. 34, Ex. 9, Ex. 14). Searle testified that he had spoken to Officer Carroll about the reduction, and that the township supervisors were going to "keep him full - the forty hours that he was doing," but cut back on the hours of other officers. Plaintiff cannot reasonably claim that the budget reduction was meant to be harmful to him given these circumstances. (Id. at Ex. 2, at 37-38).

The exact date of the November budget meeting is not given in the record, although plaintiff's complaint states that the budget reduction was made within two weeks after the date of that meeting. (Doc. No. 15, ¶ 32). Assuming that time frame to be accurate, it is a short amount of time that could be deemed suggestive. But here, the facts do not support that the temporal proximity alone shows causation. *See* McLaughlin, 277 Fed. Appx., at 219. The township supervisors were in the process of making the 2012 budget when the police budget was cut in November or December of 2011. In fact, the record reflects that the meeting in question was called to set up that very budget. (Doc. No. 34, Ex. 3, at 21). November and December are the obvious time to set up a budget for the next year, and the record reflects that the 2012 budgeting process was under way at the November meeting. It is therefore not surprising or suggestive that the township budget, which

included a reduction in police budget, was made within a short time after that meeting. Even if plaintiff's activity is the sort protected by the First Amendment, he has failed to show that the budget reduction could have been intended to harm him, and, further, to show any causal connection between the reduction and his statements to Marcho. Therefore, defendants' motion for summary judgment is **GRANTED** as to Count IV.

### Interference with First Amendment Right to Association

Count II of the complaint alleges interference with plaintiff's First Amendment right to association caused by the failure of defendants to sign his FOP applications.[8] There are two types of freedom of association claims: the right to freedom of intimate association and the right to freedom of expressive association. *See* Roberts v. U.S. Jaycees, 468 U.S. 609, 617-618 (1984). Expressive association is the right to associate and engage in activities protected by the First Amendment, such as speech, assembly, petition for redress of grievances, and exercising religion. Id. "It is well established that the First Amendment right of association guarantees the right

---

[8]Plaintiff claims that because this count was not dismissed in the decisions on two earlier motions to dismiss in this case, (Doc. Nos. 14,23), it is "law of the case" that plaintiff has proved this count, and it cannot be disposed of via the instant summary judgment motion. (Doc. No. 37, at 4-5). This argument is specious, and ignores the significant difference in standards of review between dismissal of pleadings pursuant to Fed.R.Civ.P 12(b)(6) and summary judgment pursuant to Fed.R.Civ.P. 56.

to join a union and advocate in favor of unionization." Day v. Borough of Carlisle, 2006 WL 1892711, at \*8 (Jul. 10, 2006 M.D. Pa.)(*citing* Thomas v. Collins, 323 U.S. 516, 532 (1945)).

Here, the record reflects that plaintiff submitted FOP applications to the township supervisors in 2011 and 2012. (Doc. No. 36, Exs. 2,3). Those applications have a space for a mayor or supervisor to confirm that the applicant is employed, has passed his civil service exam, and has completed his probationary period. Although defendants argue that plaintiff has failed to show that the signing of the applications was necessary for plaintiff to be considered for acceptance to the FOP, a juror could reasonably believe that the application speaks for itself, and that confirmation by the employer was necessary for consideration for membership. A jury could therefore find that refusal to sign an application for union membership constitutes interference with joining a union.

Furthermore, a question of fact exists as to the reasons that the FOP applications were not signed. Barry Searle's deposition reflects that he was unsure of plaintiff's status in terms of his "probationary period," because plaintiff had previously been suspended for a period of time. (Doc. No. 34, Ex. 2, at 49-54). But his testimony also reflects that he "found out that [the FOP] was not a social organization," as he contends plaintiff told him it was, but a union. (Id. at 60). Plaintiff, however, contends that he told the supervisors that the application was for protection of his civil rights. (Doc. No. 34, Ex. 1, at 50-

51). In doing his research, Searle discovered that the FOP would be able to represent plaintiff in collective bargaining issues, and testified that the supervisors hadn't decided if that was something they wanted or not. (Doc. No. 34, Ex. 2, at 60). While defendants claim that the supervisors were merely waiting to sign and doing research, and never refused to sign the applications, the record reflects that questions of material fact remain regarding whether the failure to sign the applications constituted interference with the right to join a union. Accordingly, defendants' motion for summary judgment is **DENIED** as to Count II.

## IV.    CONCLUSION

The claims against defendants Knowlton and Marcho in their official capacities are **DISMISSED**. Defendants' motion for summary judgment is **GRANTED** as to Counts I, III, and IV of the complaint. Summary judgment is **DENIED** as to Count II. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: December 3, 2013**

O:\Mannion\shared\MEMORANDA - DJ\2012 MEMORANDA\12-0553-01.wpd

22